**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____X

**Y.E. and M.K.** individually, and on behalf of their
child, **M.K.**, a minor,

Plaintiffs,

      -against-

**Hewlett Woodmere Union Free School District**

Defendant.
_____X

**Case No. 2:25-cv-01481**

**COMPLAINT FOR**
**ADMINISTRATIVE REVIEW**
**OF ERRONEOUS DECISIONS**
**BY THE IMPARTIAL HEARING**
**OFFICER AND STATE REVIEW**
**OFFICER**

Individuals with Disabilities
Education Act; N.Y. Educ. Law §4401
*et seq*.

Y.E. and M.K. (Parents), individually and on behalf of their minor child, M.K., allege the

following violations of their educational rights by Hewlett Woodmere Union Free School District

(Defendant or District):

## I.    PARTIES

1.      M.K. is a nine-year-old child with a disability as defined by Individuals with

Disabilities Education Act (IDEA).[1] 20 U.S.C. § 1400, *et seq*.

2.      Y.E. is M.K.'s mother and M.K. is M.K.'s father. Parents and M.K. have resided at

all relevant times within the geographical area served by the District.

3.      The District is the Local Educational Agency (LEA) responsible for providing M.K.

a FAPE under the IDEA and New York's education laws and administrative code.

4.      The District's administrative offices are located at 1 Johnson Place, Woodmere,

New York 11598.

---

[1] Please refer to Appendix A – Table of Acronyms.

## II.      JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this action under the IDEA, 20 U.S.C. § 1400, *et seq.*, and 28 U.S.C. § 1331, which confers jurisdiction in cases arising under the Constitution and laws of the United States.

6.      The Court has supplemental jurisdiction to adjudicate New York state law claims arising out of the same facts as in the asserted federal claims. 28 U.S.C. § 1367.

7.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(l) as the District has its principal offices in this judicial district.

8.      Plaintiffs have exhausted their administrative remedies for all claims that require exhaustion.

## III.      WHO IS M.K.?

9.      M.K. is a charming, humorous gregarious nine-year-old who resides with his loving family in the District. He is affectionately known as the Mayor.

10.      M.K. also has a complex medical and psycho-educational profile that severely affects his ability to learn.

11.      At age three, M.K. was identified as having DYNC1H1, a *de novo* genetic mutation linked to other developmental and medical conditions with which M.K. has also been diagnosed, including autism spectrum disorder, attention deficit/hyperactivity disorder (ADHD), epilepsy, cataracts, talipes equinovarus (clubbed foot), hypothyroidism, strabismus, and intellectual disability. It has also been linked to nerve degeneration and muscle weaknesses that affect M.K.'s lower extremities, causing fatigue while walking or holding objects.

12.      M.K. also has a history of growth hormone deficiency. He wears bifocal eyeglasses and left hinged ankle foot orthotics.

13.     But M.K. is not defined by his disabilities. To the contrary, his fearlessness and social ability would be the envy of most neurotypical children.

14.     The following video of M.K. leading a group of singing teenagers – all of whom he had just met on a cruise –  captures his joy like no words can: https://youtu.be/zxrJLLktvHM.

15.     Like all children, M.K. has a unique potential to learn in all domains of education as the American public school system has long understood the term – both traditional academic areas like reading, writing and math, and non-academic areas like socialization, resilience, and independent living.

16.     Like all children, M.K. has the right to a free appropriate public education (FAPE) – an education calculated to give him the best opportunity to reach his individual potential, as defined and guaranteed by the IDEA and New York law.

17.     M.K.'s academic needs require that he be taught by teachers skilled in Applied Behavior Analysis (ABA), the only known, evidence-based modality for teaching autistic children. ABA is a rigorous, data-driven science that a school cannot implement casually or as an afterthought.

18.     M.K. also has the right to learn with typical peers to the maximum extent appropriate. Congress passed the IDEA fifty years ago in response to decades of segregation and institutionalization of kids like M.K. The IDEA allocates federal funds to the states to help LEAs teach kids like M.K. appropriately, to help them integrate them into ordinary life in their local communities, and to help them become more independent adults. Thus, its purpose is not only to provide rigorous instruction to children with disabilities, but to do so without stigmatizing them through segregation.

19.     As explained below, the Defendant offered M.K. and Parents an awful, unlawful choice: either place M.K. in a classroom in his local public school that could not teach him effectively or send him to a highly segregated school where he would have no contact with neuro-typical children.

## IV.    LEGAL FRAMEWORK AND STANDARD OF REVIEW

### a.   The IDEA guarantees children with disabilities individualized, ambitious programs of special education and gives parents and children robust procedural rights.

20.    The IDEA offers states federal funding in exchange for their agreement to provide all students with disabilities a FAPE.

21.    States distribute these funds along with state funds to LEAs like the District, which are responsible for implementing the IDEA's extensive procedural and substantive requirements.

22.    The IDEA's FAPE requirement is straightforward: every child identified as having a disability must have a written, individualized educational program (IEP) that sets out special education interventions and other related services to give the child a real chance to reach his or her properly assessed potential. And that program must be offered in a maximally inclusive setting: children with disabilities are guaranteed the non-academic (*i.e.*, social, emotional, dignitary) benefits of learning with non-disabled peers.  This maximal inclusion guarantee is known as the *least restrictive environment* (LRE).

23.    The Supreme Court has explained that IEP is the "centerpiece" of the IDEA's "education delivery system for disabled children." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017). The crux of the Court's decision was that a team of informed school personnel, collaborating with parents, must tailor an IEP to the child's individual circumstances:

> A comprehensive plan prepared by a child's "IEP Team"[2] which includes teachers, school officials, and the child's parents, an IEP must be drafted in compliance with a detailed set of procedures.
>
> These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child.

---

[2]In New York, the IEP Team is called the Committee on Special Education (CSE).

*Id*. at 390-91.

24.    The Court emphasized the individualized nature of IEPs: "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id*. at 400.

25.    The specific factual context for the *Endrew F*. Court's decision is instructive. Endrew, a child with autism who required ABA, was making only "small advances or alterations" in public school from year to year, not meaningful progress. *Endrew F. v. Douglas Cty. Sch. Dist*., 290 F. Supp. 3d 1175, 1185 (D. Colo. 2018) (district court opinion on remand from Supreme Court). The district court and 10th Circuit had held that Endrew's progress, while minimal, satisfied the Supreme Court's then-existing standard for FAPE under *Board of Education v. Rowley*, 458 U.S. 176 (1982), which required a child only to make "more than *de minimis*" progress. *Endrew F.,* 580 U.S. at 397-403.

26.    Rejecting this formulation, the Court raised the IDEA's substantive floor for FAPE, establishing the "markedly more demanding" standard that an IEP be "appropriately ambitious in light of [the child's] circumstances." *Id*. at 402.

27.    On remand, the district court held that Endrew's IEP could not meet the Supreme Court's revisited, raised substantive floor for FAPE because it

> failed to create an educational plan that was reasonably calculated to enable Petitioner to make progress, even in light of his unique circumstances. The IEP was not appropriately ambitious because it did not give Petitioner the chance to meet challenging objectives under his particular circumstances. Specifically, the IEP proposed by the District was not reasonably calculated for Petitioner to "achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities."

*Endrew F*., 290 F. Supp. 3d at 1186.

28.     Like Endrew, M.K. made minimal progress under the District's IEPs. By the spring of 2023, his parents recognized that he would not advance meaningfully a far more rigorous and intensive program.

29.     The IDEA has robust procedural protections, which are a response to decades of public schools institutionalizing and segregating children without giving parents any means of challenging those actions.  Courts have long emphasized that a school's compliance with the IDEA's procedures is no less important than compliance with its substantive requirements.

30.     Here, as explained below, the District violated many of the IDEA's procedural protections, denying Parents their right to participate meaningfully in M.K.'s education.

**b.  The *Burlington/Carter* litigation framework applies when parents determine that their school has denied their child a FAPE, then place the child in a private school and sue for tuition reimbursement.**

31.     Under the IDEA, when a parent believes their child has not received a FAPE, they may file a Due Process complaint to request a hearing before an impartial hearing officer (IHO). This hearing is a bench trial for all intents and purposes.

32.     Among the many procedural protections in Due Process hearings, litigants may introduce records and call and cross-examine witnesses.

33.     At the conclusion of a Due Process hearing, New York IHOs issue "findings of fact and decisions" (FOFDs).

34.     Relevant to this case, parents dissatisfied with their public school's proposed IEP may enroll their child in an appropriate private school and then file a Due Process action seeking

tuition reimbursement from the public school. This type of case is litigated under the so-called *Burlington/Carter*[3] framework. Under this framework, the IHO makes three determinations:

Prong 1 – has the district offered the child a FAPE?
Prong 2 – have the parents chosen an appropriate private school?
Prong 3 – do any equitable considerations weigh against parents' tuition recovery?

35.    The IDEA counsels parents to send their district a so-called ten-day letter (TDN), a notice that they intend to place their child in private school and seek reimbursement from the district. If they fail to send a TDN, the IHO may deny them tuition reimbursement in whole or in part under Prong 3 of the *Burlington/Carter* test. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb).

36.    Once in receipt of the TDN, the school has 10 business days (including holidays that occur on business days) to consider parents' concerns and offer a new or revised IEP to address them.  If the school timely revises the IEP and parents conclude that it still does not offer a FAPE, they must assess, based on the strengths and weaknesses of that new or revised IEP, whether they are likely to prevail in litigation and be refunded private school tuition.

37.    In *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d Cir. 2012), the Second Circuit explained the rights of parents in this difficult position (*i.e.*, about to commit tens of thousands of dollars to a private school and then substantially more money to sue their school district). The court explained that they have important reliance interests in the IEP offered in response to a TDN:

> [F]or this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy ***prior to making a placement decision.*** At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on, and therefore ***the adequacy of the IEP itself creates considerable reliance interests for the parents***.

---

[3] *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985); *Florence Cnty Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

*Id.* at 186 (emphases added).

38.     As explained more fully below, both the IHO and SRO disregarded parents' reliance interests when they let the District hedge its bets and defend two very different, inappropriate IEPs and public school placements.

39.     In New York, the district bears the burden to prove that it has offered a child FAPE (*i.e.*, Prong 1 of the *Burlington/Carter* test). During a hearing, it must introduce evidence to prove that its proposed IEP was appropriate. In *Endrew F.*, the Supreme Court emphasized that, by the time of a hearing, districts should "be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." 580 U.S. at 404.

40.     Here, IHO and SRO both drew unduly favorable inferences for the District, without citing supporting evidence, to conclude that it offered M.K. a FAPE. They also unlawfully shifted the evidentiary burden to make Parents prove that the District did not offer a FAPE.

## V.     FACTUAL BACKGROUND

### a.     M.K. languishes for several years with the District's inadequate programming. The District fails to propose an appropriate IEP in the least restrictive environment (LRE).

41.     In the fall of 2020, M.K. started kindergarten in the District. The District's CSE proposed an IEP to be implemented in a classroom with 12 students, 1 teacher, and 2 aides (12:1:2). He would also have 1:1 paraprofessional support, occupational therapy three times every 6 days,[4] as well as small group speech language therapy twice, and physical therapy twice. He was also supposed to have a Behavior Intervention Plan (BIP), something he had during preschool.

---

[4] The District uses a 6-day cycle for scheduling.

42.     The District administered psychological and educational evaluations (including occupational therapy and speech therapy evaluations) of M.K. in January and February of 2021. The examiner noted M.K. to be a sweet and friendly child who cooperated and worked appropriately for a student his age during the test. It was further noted that M.K. responded well to positive encouragement and prompting on test items when he could not provide a quick response.

43.     These evaluations together showed M.K. struggled with, among other things, verbal comprehension, visual spatial processing, processing speed, attention, visual motor and fine motor skills, core strength, handwriting grip and hand stability, externalizing problems, articulation, understanding sentences and following directions.

44.     The CSE met on March 12, 2021 to prepare an IEP for the 2021-2022 school year (first grade). It acknowledged that M.K. was making little progress towards his Kindergarten IEP goals and required a multi-sensory approach to learning, frequent reteaching of letters, sounds and sight words

45.     The CSE acknowledged that M.K.'s behaviors interfered with his ability to learn, yet they failed to perform a new functional behavior assessment (FBA). Moreover, M.K.'s "adapted" BIP was discontinued.

46.     Despite M.K.'s lack of progress, the CSE recommended a first grade IEP that was largely the same as his kindergarten IEP .

47.     M.K. struggled again in first grade, making little progress towards his IEP goals. By the end of first grade, he could not identify upper or lower-case letters or identify numbers and quantities up to ten.  He was unable to achieve his goal of communicating his needs/wants and ask for help given teacher models with no more than two prompts.

48.    He was also engaging in frequent classroom behaviors that impeded access to his education. In January of 2022, the District conducted an FBA, ostensibly to identify the environmental factors (settings), precipitating causes, purposes and consequences of these behaviors – something it should have done much earlier.

49.    The three target behaviors identified in the FBA included non-compliance, minor disruption (including: whining, crying, calling for teacher, leaving seat without permission, touching other's items and pushing items with minimal force off desk) and major disruption (including: escalated crying and whining, throwing self to floor, physical aggression).

50.    During classroom observations for the FBA, M.K. engaged in 73 separate interfering behaviors.

51.    The FBA noted that M.K. required frequent specific positive reinforcement delivered by teachers, teacher assistants and the 1:1 aide for on-task behavior.

52.    It further noted that M.K.'s significant delays in skills acquisition were related to his problem behaviors in view of the settings where many of his behaviors were exhibited. It further noted that M.K. struggled with most academic tasks due to his inability to retain skills previously taught, especially in math, reading and writing, and demonstrated less behaviors during recess, music, phonics, social studies and mindfulness due to decreased demands. In sum and substance, M.K.'s behaviors were directly related to his academic struggles. M.K. had difficulty with transitions when faced with leaving a preferred task.

53.    The FBA specifically hypothesized that the main function of M.K.'s disruptive behaviors was escape/avoidance of work completion and less preferred tasks.

54.    The FBA recommended functional communication training through positive reinforcement, differential reinforcement for task initiation and remaining on task, visual cues,

previewing less preferred tasks preemptively, use of non-contingent breaks, ongoing preference assessments to identity new reinforcers, truncated tasks, task boxes to utilize for difficult tasks, impending choices and use of a timer.

55.    M.K.'s first grade teachers noted that M.K.'s inability to learn letters, letter sounds, and sight words was a source of great frustration for him. Nevertheless, the FBA did not address academic frustration due to his skill deficits. In other words, a proper program to address M.K.'s frustration-based behaviors would not only seek to minimize his behaviors, but also teach him the skills whose absence frustrated him and caused him to act out.

56.    Regardless, although the District claimed to have implemented a BIP for first grade, it introduced no documentary evidence to prove that a BIP was in place.

57.    The District also recommended a vision evaluation, which was performed on January 19, 2022. The report noted M.K.'s diagnosed cataract and amblyopia in his right eye, and a cataract and strabismus in his left eye, for which he underwent several surgeries. M.K. wears bifocal glasses full time. The evaluation concluded that M.K. demonstrated significant ocular motor deficits in tracking, scanning and visually directed reach, and recommended itinerant teacher services for the visually impaired twice per week to address ocular motor issues, visual memory and processing and to lessen the effects of visual impairment.

58.    The CSE convened on March 8, 2022 to prepare an IEP for second grade. Despite M.K.'s demonstrable lack of progress under his first grade IEP, aside from adding vision services and once-monthly parent training, the District offered largely the same inadequate program in a 12:1:1 classroom for second grade. Even the addition of a 1:1 teaching aide did not lead to M.K. making academic improvement.

59.     The second grade IEP's unambitious goals confirm M.K.'s lack of progress in first grade.  For example, his first grade reading goals had been to identify 26 lowercase and uppercase letters and identify 25 sight words. In his second grade IEP, his goal was *reduced* to naming only the seven letters in his first and last name.

60.     Similarly, his first grade math goal was to identify numbers and quantities up to 10. But his second grade goal was only to match quantities to numbers, numbers 1-6.

61.     The second grade IEP also failed to provide Assistive Technology (AT) to address M.K.'s communication needs, indicating that AT was not applicable.

62.     The CSE also considered and rejected an 8:1:2 classroom as being overly restrictive, offering M.K. no opportunities for mainstreaming.

63.     Unsurprisingly, M.K. made little progress during second grade in what was essentially the same program. He continued to struggle to acquire and retain basic skills.

64.     The District failed to implement M.K.'s second grade IEP with fidelity. For example, instead of receiving individualized 1:1 support from a dedicated teaching assistant, M.K. received help from any classroom aide who happened to be available. This arrangement interrupted the continuity of programming for him.

65.     As the year progressed, M.K. began protesting before boarding the bus to school, and exhibited behaviors due to his anxiety – frequent bowel and urine accidents while at school. He began to shut down when Parents attempted to help him with homework, and increasingly exhibited behaviors at school due to his frustrations in the classroom and an inability to keep up with his peers.

66.     By the end of second grade, he could only match pictures with beginning sounds with a set of "well-rehearsed pictures," and required a limited number of choices while matching.

67.     The Parents requested a CSE program-review meeting mid-year.  Before that meeting (held on April 17, 2023), M.K.'s mother had an informal with his second grade teacher and the school psychologist. She expressed concern about M.K.'s lack of progress and asked them to consider sending application packets to possible New York State approved, out-of-district special education schools. They told her that only the special education director could send out such packets.

68.     At the April 17, 2023 CSE meeting, M.K.'s mother formally asked the team to send out application packets, but the special education director refused, erroneously saying that the CSE could not recommend an out of district placement until M.K.'s "behaviors were under control."

69.      Instead, the CSE made minor changes to M.K.'s program, which yielded little progress for the remainder of the 2022-23 school year. His behaviors continued to interfere with his education.  And while the District added a Behavior Intervention Plan (BIP) entitled "Updated April 2023", Parents had seen no evidence that the school had been implementing a BIP. Moreover, the targeted behaviors listed in the BIP were inconsistent with the behaviors identified in the FBA.

70.     Frustrated with M.K.'s lack of progress and the school team's apparent inability to teach him effectively, Parents obtained an independent neuropsychological evaluation from Dr. David J. Marks. The evaluation was performed between March 7, 2023 through April 27, 2023.

71.     Dr. Marks' evaluation revealed M.K.'s cognitive functioning within the extremely low range across his verbal and nonverbal abilities as well as his underlying component processes (fluid reasoning, knowledge, visual-spatial analysis, quantitative reasoning and working memory). However, he noted that M.K. scored considerably better on alternate metrics designed to reduce the contribution of language to both the administration and demands of the intellectual assessment.

72.    Based on his review of M.K.'s previous assessments, Dr. Marks noted a progressive deterioration over the previous three years, and that M.K. demonstrated "unambiguous regression in his present setting."

73.    He further noted that the discrepancy between M.K.'s performance on nonverbal assessments and conventional intellectual assessments underscored the impact of M.K.'s language delays and emphasized the importance of a multisensory learning environment and visual cues.

74.    Dr. Marks recommended that M.K. attend a small, highly structured, and individualized program anchored to principles of applied behavior analysis (ABA), and which would emphasize the development of language and the opportunity to reinforce language comprehension and expression.

75.    He further recommended that M.K. be placed with students who would serve as behavioral role models performing at or above his intellectual, linguistic and behavioral level. He Marks recommended against placing M.K. with students externalizing behaviors.

76.    Parents gave Dr. Marks' report to the District on June 1, 2023.

**b.  The District's first IEP offering for 2023-24.**

77.    On June 14, 2023, the CSE convened and proposed an IEP for third grade.

78.    M.K.'s teachers and related service providers conceded that he had made inconsistent progress toward his goals and had still not mastered basic academic skills, such as letter/sound correspondence.

79.     The CSE recommended an 8:1:2 District program at Ogden Elementary School,
continuation of M.K.'s related services, assignment of a 1:1 Board Certified Behavior Analyst
(BCBA) for six hours daily,[5] AT services and continuation of all other related services.

80.     M.K.'s mother disagreed that the CSE's proposed 8:1:2 was appropriate for M.K.
because the program (which the CSE itself had earlier rejected), was designed for students with
far lower language and social skills.

81.     Dr. Marks discussed his evaluation at the CSE meeting and opined that the 8:1:2
program might be too large for M.K. The classroom profile showed that, of the six other students
enrolled, half required an augmentative alternative communication (AAC) device to communicate.

**c.   The District's second IEP offering for 2023-24.**

82.     On June 23, 2023, the District finally agreed to send application packets to out-of-
district programs. Of the eleven contacted, only the Nassau County Boards of Cooperative
Educational Services at the Willet Avenue School (BOCES)[6] responded.

83.     Parents and M.K. toured BOCES on August 7, 2024. They saw a blue, padded time-
out or isolation room, classrooms with padded areas in the back, students using communication
devices, and students who were dysregulated and having meltdowns. They were told that M.K.
were told that it "didn't seem like he would need it."

84.     When M.K.'s mother expressed concern about the nonverbal students to Ms. Owen,
the BOCES principal, she responded that "some students" more verbal than that. Parents expressed

---

[5] As explained below, it was nonsensical to propose a 1:1 BCBA for six hours daily given the
supervisory nature of a BCBA's work. It proved that the CSE wrote the IEP without considering
whether it could implement it. The SRO then erred by inferring programmatic substance from this
implausible recommendation.

[6] BOCES is a network of specialized schools that the State of New York created to provide shared
educational    programs    and    services    to    school    districts    within    the    state.    *See*
https://www.boces.org/about-boces/.

concern that M.K. required ABA instruction and more reading instruction due to his deficits, but were told several times by Owen that BOCES was an ADL (activities of daily living) program.

85.    Parents also learned that there was a single BCBA for the entire building. Moreover, she was a classroom teacher, not a program supervisor who could design, direct or oversee any program (*i.e.*, perform the *actual* duties of a BCBA), ABA or otherwise.

86.    At the end of the tour, Owen told Parents they would hear back from BOCES with a decision within a week, but several weeks went by and they received no information. M.K. had not yet been admitted to BOCES and the District had not offered it as a placement for him.

87.    BOCES was inappropriate for the many of the same reasons that the 8:1:2 District program was inappropriate: M.K. would be entirely segregated from typical, nondisabled peers and would not be with peers who had similar language and social skills. In other words, BOCES was even more restrictive than the District's proposed placement.

88.    On August 22, 2023, having been offered no alternative to the inappropriate 8:1:2 District program (BOCES had still not offered admission to M.K.), the Parents, through counsel, sent the District a TDN, notifying it that they had rejected the CSE's 2023-2024 program recommendation, intended to unilaterally place M.K. at Imagine Academy, and would seek reimbursement for tuition and roundtrip transportation to Imagine for the 2023-2024 school year.

89.    That night (August 22), the District's director of special education, circumventing counsel, called M.K.'s mother directly to say that BOCES was going to accept M.K. and that Parents would receive an acceptance letter in a few days. Because Parents were represented by counsel, which the District knew, M.K.'s mother declined to speak at length with the director.

90.    On August 30, 2023, Parents finally received an acceptance letter from BOCES.

91.    The CSE then scheduled a program review meeting for September 6, 2023, the same day that M.K. started at Imagine Academy, and more than 10 business days following their August 22, 2023 TDN.

92.    At the meeting, the District recommended the more restrictive 6:1:2 BOCES program.

93.    Despite proposing an entirely different placement, with very different staff composition and facilities from the District's 8:1:2 classroom, the CSE did not modify M.K.'s IEP at all.

94.    Ms. Owen participated and recommended the placement on the basis that M.K. would have "good peer models," despite BOCES having no typical, non-disabled students, and despite many of the students functioning and communicating at a far lower level than M.K.

95.    Parents disagreed with the recommendation.  BOCES was even more restrictive than the 8:1:2 District program, and, like that program, lacked appropriate peers. They also rejected the program because it did not offer ABA instruction, which Dr. Marks recommended and which the CSE agreed was necessary for M.K. to make progress.

96.    Having received no offer of FAPE for M.K., Parents maintained M.K.'s placement at Imagine Academy and filed a Due Process complaint to start this lawsuit.

## VI.    PARENTS AND THE DISTRICT LITIGATE A DUE PROCESS HEARING. THE IHO REACHES A FACTUALLY AND LEGALLY UNSUPPORTABLE DECISION.

97.    Parents filed a timely Due Process complaint on January 5, 2024.

98.    They alleged that the District violated the IDEA and New York Education laws procedurally and substantively, had failed to offer M.K. a FAPE for the 2021-22, 2022-23, and 2023-24 school years.

99.     They further alleged that Imagine Academy was an appropriate placement for which they should be reimbursed, and that no equitable considerations would call for reduction of their reimbursement.

100.    Impartial Hearing Officer (IHO) Jean M. Lucasey, Esq. was appointed to conduct the hearing.

101.    The District bore the burden of proving that it had offered M.K. a FAPE, in the least restrictive environment, for the three school years in question.

102.    But during seven days of trial, the District failed to prove that it complied with the IDEA's procedural or substantive requirements, or had offered M.K. an IEP calculated for him to make appropriate progress in light of his circumstances.

103.    However, the IHO disagreed, In an FOFD dated September 10, 2024, the IHO held that the District met its burden of proof for all three school years. ***See* FOFD, attached as Exhibit A.**

104.    In *Endrew F.*, the Supreme Court held that a district must provide an IEP with appropriately ambitious goals, and a program of special education calculated for the child to make progress appropriate in light of his or her individual circumstances. 580 U.S. at 403. An IEP "must be constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id*. at 400. By the time of a Due Process hearing, the CSE must "be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id*. at 404.

105.    The *Endrew F.* court also emphasized that to offer FAPE a district must offer a program calculated for the child to make far more than *de minimis* progress: "When all is said and

done, a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all." *Id*. at 402-03.

106. When a child fails to make progress under an IEP in one school year, a school district cannot offer him or her FAPE through the same IEP for the following school year. *R.N. v. Iroquois Cent. Sch. Dist.*, No. 14-CV-211(LJV), 2016 U.S. Dist. LEXIS 158929, at \*51 (W.D.N.Y. Nov. 15, 2016) ("[I]f a student has failed to make any progress under an IEP in one year, a court 'would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate.'") (Quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 534 (3d Cir. 1995)).

107. The record is full of evidence detailing M.K.'s complex educational profile, as well as his individualized needs arising out of this profile. It is also full of evidence that the District failed either to program appropriately for M.K. or to change its year-over-year programming recommendations in response to his ongoing struggles.

108. For the reasons explained below, the IHO's decision is superficially and poorly reasoned, contrary to the law and evidence, and entitled to no deference by this Court.

**a. The IHO failed to analyze or explain M.K.'s disability, strengths or individualized needs.**

109. To judge the District's IEPs, the IHO had to measure the programs and services offered in those IEPs against M.K.'s individualized educational needs. As the *Endrew F.* court wrote: "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." 580 U.S. at 400.

110. Put simply, to make a reasoned decision, the IHO had to ask three questions: Who was M.K.? What were his individualized needs? Did the District's IEPs meet those needs? The IHO's FOFD is fundamentally flawed because it does not pose or answer these three questions.

111.    Instead, the FOFD reduces M.K.'s complex profile to a single sentence that does no more than list his "multiple diagnoses." FOFD at 5. It does not analyze M.K. as a learner, discuss how his disabilities affected him academically and behaviorally, discuss his strengths, or discuss the programming, accommodations and related services that were necessary to give him a reasonable chance to make progress appropriate in light of his circumstances.

### b.  The IHO erred in holding that the District offered M.K. a FAPE for the 2021-2022 school year.

112.    M.K. made almost no progress during the 2020-2021 school year in the District's 12:1:2 classroom.  Although the March 12, 2021 CSE admitted this problem it offered virtually the same 12:1:2 program for the 2021-2022 school year.

113.    The IHO completely ignored this obvious flaw with the 2021-2022 IEP, never mentioning how M.K.'s lack of progress during the 2020-2021 should have informed the March 2021 CSE's programming decisions. Her analysis is fundamentally flawed on that basis alone.

114.    The adage *show, don't tell* applies.  In finding that the District offered M.K. a FAPE for the 2021-2022 school year, the IHO did no actual analysis.  *See* FOFD at 9-11. Rather, she recited the elements of the March 2021 IEP without explaining how they addressed M.K.'s known needs (which she also never explained).

115.    The IHO then gave dispositive weight to the opinion testimony of M.K.'s first grade teacher to find that the 2021-2022 IEP offered M.K. a FAPE.

116.    Rather than analyze whether the teacher's opinion actually proved that the IEP met M.K.'s needs or that he made progress appropriate in light of his circumstances, the IHO focused solely on her credibility.

117.    The IHO then stated a *non sequitur* that betrayed her misunderstanding of basic trial practice: "The Parents did not cross-examine the teacher and, therefore, neither directly

challenged the appropriateness of the 2021-2022 school year program at hearing nor disputed the accuracy of the teacher's testimony." FOFD at 10.

118.   There are numerous reasons for a party not to cross-examine a witness, a chief one being that the witness helps their case. *See* 2 Federal Litigation Guide § 35.08 ("A primary factor in determining whether to cross-examine is whether the witness provided damaging testimony. If the witness has not hurt the case on direct examination, consider foregoing cross-examination altogether unless it is highly likely that favorable testimony can be elicited.").

119.   Here, regardless of whether the first grade teacher's testimony was credible, Parents did not need to cross-examine her because, on direct examination, she proved the substantive point that M.K. made no more than *de minimis* progress in the District's first grade 12:1:2 classroom.

120.   The IHO never analyzed whether the gradual progress that she found M.K. made was appropriate progress, as opposed to mere *de miminis* progress, which the *Endrew F.* court rejected.

121.   The evidence suggests the latter: The teacher described M.K.'s progress in first grade as "small, small gains." His first grade school reports lack evidence of meaningful progress. The IHO did not explain how M.K. made meaningful progress during the 2021-2022 school year.

122.   At best, the IHO cited testimony that M.K. progressed from a "pre-A" reading level, at which a child might not yet understand the concept of print, to "Level A" where he is just beginning to develop the concept of print, and that Level A contains a beginning amount of high-frequency words that M.K. would be able to recognize such as "I", "see" or "go."

123.   However, the IHO ignored testimony that M.K. could not recognize "I", "see" or "go" independently; rather, the teacher had to prompt him by showing him the text and saying: "I know you see the word go, you see the word see." In fact, she testified that "maybe at the end of the school year he would be able to identify maybe four or five words."

124.    The IEP progress report corroborates that M.K. could not read these words independently, that he struggled to acquire and retain sight words, that the skill was inconsistently demonstrated, and that when he could identify the word, he could only do so when given a choice of three words. Focusing entirely on the teacher's credibility rather than the substance of her testimony, the IHO failed to explain how M.K. made more than *de minimis* progress.

125.    The IHO further erred in finding that the District implemented a BIP for M.K. in first grade where it placed no written BIP into evidence.

126.    These errors with respect to the IHO's analysis of the 2021-2022 IEP are illustrative rather than exhaustive.

### c.  The IHO erred in holding that the District offered M.K. a FAPE for the 2022-2023 school year.

127.    The IHO's analysis of the 2022-2023 IEP is similarly flawed. It failed to describe M.K.'s individualized needs as understood in March 2022. In describing the IEP proposed for 2022-2023, the IHO never explained how it was calculated to meet M.K.'s updated needs and or to allow him to make appropriate progress.

128.    The IHO held that the District programmed appropriately for M.K.'s behaviors, but she overlooked or ignored that the District introduced no written BIP for the bulk of the 2022-2023 school year.

129.    Again, elevating a District witness's credibility to overcome its failure to introduce documentary evidence, the IHO held without any solid basis that the District provided M.K. with appropriate behavioral support.  FOFD at 12-13.

130.    The IHO ignored multiple inconsistencies in the District's evidence of its behavioral programming for M.K.   The only BIP in evidence is dated April 2023, and it disregards or conflicts with the District's February 2022 FBA.

131.    The IHO also failed to address the evidence that M.K. was not consistently provided individualized instruction by a 1:1 for reading instruction, but instead, was grouped with other students with greater reading skills, to the point of causing him severe frustration. This lack of structured, consistent instruction on a 1:1 basis conflicted with his IEP and, as a result, M.K. was unable to make appropriate progress.

132.    In short, as with the 2021-2022 IEP and school year, the IHO offered superficial analysis of M.K.'s 2022-2023 IEP and school year.

133.    These errors with respect to the IHO's analysis of the 2022-2023 IEP are illustrative rather than exhaustive.

### d. The IHO erred in holding that the District offered M.K. a FAPE for the 2023-2024 school year. The CSE's proposed IEP and placement(s) were not appropriate. Parents should not have been forced to challenge two different proposed placements.

134.    For the same reasons discussed for the prior two school years, the IHO erred in holding that the District offered M.K. a FAPE for the 2023-2024 school year.

135.    The IHO again failed to address M.K.'s changing needs as of June 2023, when the CSE met to propose an IEP for the 2023-2024 school year.

136.    The IHO disregarded that the CSE proposed an inappropriate 8:1:2 classroom for the 2023-24 school year, a placement it ruled out for the 2022-2023 school year because the students were too low functioning to be suitable peers for M.K. M.K.'s teacher (whom the IHO deemed credible) testified that the class consisted of students who were "learning to communicate at very basic levels. They're learning to make very basic requests, they might have very, very early stages of communication, they might struggle to even communicate on very beginning levels like eye contact or even responding to their name." By contrast, M.K.'s strength was interpersonal

communication; to deprive him of contact with typically communicating peers would have caused devastatingly isolation.

137.    The IHO also erred by summarily rejecting Dr. Marks' testimony on the District's inappropriate programming on the incorrect basis that he was speculating about the District's pedagogy.    FOFD at 15 n.14. The IHO wrote that because Dr. Marks did not use the word "pedagogy" in his report, he could not opine on the District's pedagogy. But, perhaps misunderstanding the word "pedagogy" – the study of the methods and activities of teaching[7] – the IHO overlooked that Dr. Marks' report discusses problems with the design and implementation of M.K.'s educational program and offers several pages of educational (pedagogical) recommendations.

138.    The IHO also erroneously relied on the district court's decision in *A.M. v. New York City Department of Education*, 2015 WL 8180751 (S.D.N.Y. Dec. 7, 2015), for the proposition that the CSE did not have to adopt Dr. Marks' recommendations because his report "supported the CSE's program recommendations even though the CSE's recommendations were not consistent with the [his] recommendations." FOFD at 17.   In that case, however, the Second Circuit performed an independent review of the record and found "significant deficiencies" the district's programming. It reversed the district court's decision (along with the decisions of the IHO and SRO), holding – also in a case involving the failure to provide necessary ABA services – that where a "CSE meeting yield[s] a clear consensus, an IEP formulated for the child that fails to provide services consistent with that consensus is not 'reasonably calculated to enable the child to receive educational benefits.'" *A.M. v. N.Y.C. Dep't of Educ.,* 845 F.3d 523 (2d Cir. 2017).

---

[7] Online Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/pedagogy (Visited Feb. 19, 2025).

139.    Here, like in *A.M.*, there was a clear consensus that M.K. needed an ABA program implemented with fidelity. The District even argued that it offered an ABA program.  Nevertheless, the IHO erred when she failed to make the District prove it had done so.  The IHO credited superficial testimony from the District's assistant director of special education that the proposed program for M.K. was "anchored in ABA principles." But the assistant director lifted this phrase directly from the IEP and did not explain what it meant. Had the IHO scrutinized the District's evidence, as the IDEA required her to do, she would have found no true ABA program.

140.    The IHO then made another reversible error by allowing the District to introduce evidence about the belatedly proposed BOCES program.

141.    On August 22, 2023, having rejected the District's IEP, Parents sent the District a TDN to notify it that they intended to enroll M.K. at Imagine Academy at their own expense and would seek tuition reimbursement. The District then had ten business days to respond to that TDN and make an offer of FAPE. It failed to do so.

142.    At that moment, Parents had a "considerable reliance interest" in the June 2023 IEP, *R.E.*, 694 F.3d at 186, having decided to place M.K. at Imagine Academy and litigate at their own financial risk based on their reasoned assessment that the IEP was inappropriate. The June 2023 IEP was therefore the only program that the District was legally permitted to defend at trial. The IHO should not have allowed the District to defend its belated, second proposed program at BOCES, which was offered outside the permitted ten business days.[8]

143.    Even after getting a mulligan, the District did not prove that the BOCES program was appropriate.

---

[8] The SRO made the same reversible error.

144.    As discussed above, despite proposing a very different 6:1:2 classroom placement at BOCES, with dramatically different student composition, staff composition and facilities from the District's 8:1:2 classroom, the CSE did not change M.K.'s IEP to fit that placement.

145.    BOCES was even more restrictive than the District's inappropriate 8:1:2 program, and, like that program, lacked appropriate peers for M.K.

146.    And like the District's 8:1:2 program, there is no reliable evidence showing that it would have offered M.K. ABA instruction, let alone with fidelity.

147.    Again, the IHO based her findings inappropriately on witness demeanor rather than substance:

> The principal explained upon re-direct that the teacher assigned to the recommended classroom was "very trained" in using ABA techniques, was "a veteran teacher with previous ABA experience" before she joined the BOCES school and that she had worked at the school for years. Tr. 381. The principal further explained that the staff assigned to the 6:1:2 program were well-versed in implementing behavior intervention plans. *Id*. I credit the principal's testimony as her answers demonstrated solid working knowledge of the communication and behavioral needs of the students in the subject 6:1:2 classroom, she gave straightforward and plain-speaking answers even during cross-examination, and her confidence that the classroom and the program met the Student's needs never wavered.

148.    In so holding, the IHO ignored: (1) that the only BOCES teacher trained in ABA techniques was not M.K.'s proposed teacher; and (2) the District's IEP for the proposed BOCES program was written for the District's 8:1:2 classroom and did not set forth how BOCES would apply ABA with fidelity to meet M.K.'s needs.

149.    The IHO erred by permitting the District to argue that the BOCEs program offered FAPE, and then erred by finding that it did so.

150.    These errors with respect to the IHO's inappropriate analysis of the District's two, alternate 2023-2024 IEPs are illustrative rather than exhaustive.

## VII.    THE SRO ERRONEOUSLY AFFIRMS THE IHO'S DECISION.

151.    Parents filed a timely request for review of the IHO's FOFD to the New York SRO, asking it to review and vacate the IHO's numerous factual and legal errors.

152.    In a decision dated December 9, 2024, the SRO largely rubber stamped the IHO's analysis, repeating the same errors.  ***See* SRO No. 22-468 (SRO Op.), attached as Ex. B.**

153.    The SRO incorrectly reframed the IHO's holding that parents' failure to cross examine M.K.'s first grade teacher amounted to conceding that the District offered M.K. a FAPE in first grade.  SRO Op. at 12.

154.    Unlike the IHO, the SRO acknowledged that a "prior IEP is a relevant area of inquiry for purposes of determining whether an IEP has been appropriately developed." SRO Op. at 14-15. But like the IHO, the SRO completely ignored evidence about M.K.'s struggles during the 2020-2021 school year in finding that the March 2021 IEP was adequate.

155.    The SRO excused the District's failure to propose a behavioral plan in March 2021 by holding that the March 2021 IEP "did recommend strategies, including positive behavioral interventions, supports, and other strategies to address the student's behaviors that impeded the student's learning or that of others, such as 1:1 aide services."  SRO Op. at 13. But like the District and the IHO, the SRO never described those generic strategies, positive behavioral interventions and supports, let alone explained how they were tailored to M.K.'s unique behaviors.

156.    Like the IHO, the SRO ignored that the District did not prove that it offered behavioral strategies or interventions that were consistent with the recommendations of its own February 2022 FBA.

157.    Like the IHO, the SRO erred in finding, based solely on self-serving and conclusory testimony, that the District had a BIP in place throughout the 2022-23 school year (as opposed to unsystematic strategies), despite there being no documentary evidence.  SRO Op. at 16. Moreover,

like the IHO, the SRO disregarded the overwhelmingly inconsistency of witnesses trying in vain to describe the District's behavioral strategies and interventions. The SRO cited a single District exhibit to support the proposition that "the district was collecting data pursuant to a BIP throughout the 2022-23 school year, specifically during the time period from September 2022 to May 2023." *Id*. (Citing D-29). However, that exhibit consisted of a single bar graph without back-up data, certainly nothing indicative of a systematic behavioral intervention with rigorous data collection.

158.     Like the IHO, the SRO recited facts suggesting that M.K. made minimal progress in several areas during the 2021-2022 and 2022-2023 school years, but he never explained how that minimal progress was appropriate progress in light of M.K.'s individual circumstances. And the SRO ignored that during the June 2023 CSE meeting, M.K.'s teachers and related service providers expressed that M.K. made inconsistent progress toward his achieving his goals, and had still not mastered basic academic skills, such as letter/sound correspondence.

159.     The SRO also repeated the IHO's errors regarding the 2023-2024 school year, and introduced new arguments *sua sponte* to support the District's case.

160.     The SRO found that the June 2023 CSE offered M.K. an ABA program. In a finding that went beyond the evidence in the record, the SRO wrote that the District's proposal for a BCBA to accompany M.K. as a 1:1 aide satisfied its burden:

> To the extent that the parents assert, on appeal, that the recommendation for individual BCBA services for six hours per day is not a program "anchored in ABA," such an argument makes little sense as it is representative of an individual service designed to deliver individual behavioral support to the student throughout the school day. Review of the psychologist's testimony regarding what he intended when he recommended a program "anchored in ABA" shows that he indicated he expressed a concern about the 8:1+2 special class, but does not show an objection to the recommendation for individual BCBA services (Tr. pp. 577-79). Additionally, in his description the psychologist identified his preferred program for the student as a program where the staff "working with [the student] hav[ing] formal training, background, expertise, credentials in working with youth on the autism spectrum" (Tr. p. 577); ***something that would be addressed by having a BCBA with the***

***student six hours per day.*** The parent's arguments to the contrary are belied by the evidence and not plausible.

SRO Op. at 18 n.12 (emphasis added)

161.    The SRO's *sua sponte* argument exemplifies his factual and legal overreach. In explaining how the District's proposal for a 1:1 BCBA met its burden – something about which the District introduced little evidence – the SRO belied his own fundamental misunderstanding of a BCBA's professional role.

162.    Although qualified to do so, BCBAs rarely serve as daily 1:1 behavioral aides. Rather, they are supervisory professionals who design BIPs, oversee behavioral technicians, and audit behavioral data to ensure its rigor. Hiring a BCBA on a 1:1 daily basis would be cost prohibitive for any school – costlier than sending a child to private school. Rather than credit the District, the SRO should have seen through the proposal for a 1:1 BCBA as wholly implausible.

163.    Moreover, as Parents argued to the IHO and SRO, even assuming the District did plan to hire a BCBA as a daily 1:1 aide for M.K, the evidence proves that it had not found a one for the 2023-2024 school year. In fact, in an email dated August 22, 2023 – the same day as Parents' TDN and just days before the start of the school year – Access 7 Services, Inc., the agency with whom the District contracted for behavioral services, expressed surprise at the recommendation and stated unequivocally that, if the District really wanted a BCBA for six hours daily, it could not have provided one:

Hi Laura,[9]

Sorry to pester you but we need more information regarding this case as we are having a very difficult time being able to schedule this.
***Additionally, if the 6 hour daily support needs to be provided by only a BCBA, we definitely do not have anyone available.***

---

[9] Laura Peterson was the District's Assistant Superintendent for Special Education and Student Support Services.

Please let us know ASAP.

Lisa
Lisa Sells-Asch
Placement Coordinator
Access 7 Services, Inc.

Parents' Ex. OO (emphasis added).

164.    The SRO dismissed Ms. Sells-Asch's unequivocal statement –"we definitely do not have anyone available" – as mere "doubt," writing: "[D]oubt, without more, is not a sufficient basis to hold that a district could not implement the services recommended in the student's IEP and thus the parents' argument must fail." SRO Op. at 21.

165.    The Court owes zero deference to the SRO's misreading of Sells-Asch's August 22, 2023 email, which simply defies reason. She could not have been clearer: there would be no 1:1 BCBA for M.K.

166.    The SRO's analysis of the District's proposed BOCES program was even more flawed. He expressly allowed the District to divorce its proposed educational *program* from its proposed *placement*:

> The parents also argue the IHO erred in determining the 6:1+2 BOCES special education class was an ABA program. However, it is worth noting that the district canvassed out of district programs at the parents' request for the district to do so (Parent Exs. V; NN). After one of the programs accepted the student, the CSE then reconvened in September 2023 to offer the parents a recommendation for that program; ***however, at that time, the September 2023 CSE did not recommend that the student receive six hours per day of BCBA services; instead, the CSE changed the student's individual support back to six hours per day of 1:1 aide services (Dist. Ex. 4 at p. 17).***
>
> At that point, for the purpose of the district implementing an educational program for the student for the 2023-24 school year, the parents could have opted for either the district's 8:1+2 special class with the support of individual BCBA services, which as discussed above was an ABA program, or the September 2023 IEP which recommended a 6:1+2 special class at a BOCES and did not include BCBA or ABA services in the IEP (Dist. Exs. 4; 6). ***What the parents could not do is compel the district to implement an educational program that it had not recommended, i.e. the provision of ABA services at the BOCES***

***program.*** Claims regarding an assigned school's ability to implement an IEP must be "tethered" to actual mandates in the student's IEP (*see Y.F.*, 659 Fed. App'x at 5).

SRO Op. at 21 (emphases added).

167.　The SRO thus endorsed the District's impossible choice for Parents: Choose an inappropriate, in-District ABA program (*i.e.*, the 8:1:2 class with an all-day 1:1 BCBA, implausible on its face, which would not have been implemented) or a highly restrictive BOCES 6:1:2 program that did not include ABA as part of the revised IEP.  In other words, according to the SRO, M.K. was not entitled to an ABA program in an appropriate setting, despite clear consensus that he needed an ABA program.

168.　***But of course Parents could demand that the District offer M.K. an appropriate program in an appropriate setting.***  The Second Circuit's judicial balancing test to decide whether a proposed placement is the child's LRE does not let schools simply jettison the substance of a child's IEP (*i.e.*, specially designed instruction) to find an appropriate physical location for the child. To the contrary, the touchstone of the LRE test is to identify the least restrictive setting *in which the appropriate program (IEP) can be implemented*.  *See P. v. Newington Bd. of Educ.*, 546 F.3d 111, 120 (2d Cir. 2008). If a school cannot implement the IEP in a mainstream setting, is it then permitted to offer a more restrictive setting to do so? But it is never excused from providing an appropriate program of special education.

169.　The SRO's holding flips the LRE rule on its head (or simply abandons it): M.K was somehow only entitled to appropriate instruction (ABA with fidelity) if the District happened to find somewhere it could implement it.  Otherwise, he had to make do with whatever program and placement they happened to offer. This was a clear error of law.

170.　These errors with respect to the SRO's decision are illustrative rather than exhaustive.

## COUNT I.

### Denial of FAPE; Reversal of Erroneous IHO and SRO Decisions.

171.    Parents incorporate the above allegations.  Moreover, they are illustrative rather than exhaustive.

172.    The decisions of the IHO and SRO are clearly erroneous and contrary to unrebutted facts in the record.

173.    The IHO and SRO both applied incorrect legal standards and improperly shifted the burden of proof from the District to Parents, which resulted in both reaching incorrect legal conclusions.

174.    Parents and M.K. have been denied a FAPE under the IDEA and the New York Education Code for the 2021-2022, 2022-2023, and 2023-2024 school years.

175.    Wherefore, Parents ask that this Court reverse the IHO's and SRO's decisions and find that the District failed to offer Parents and M.K. a FAPE for the 2021-2022, 2022-2023, and 2023-2024 school years.

## COUNT II
## IDEA
### *Attorney's Fees*

176.    Parents incorporate the above allegations.

177.    Parents believe they will prevail in this action for administrative review, in which they request that this Court reverse the IHO's and SRO's erroneous decisions. In the event they prevail, Parents will be "prevailing parties" under the IDEA. 20 U.S.C. § 1415(i)(3)(B).

178.    A prevailing party under the IDEA is entitled to reasonable attorney's fees. 20 U.S.C. § 1415(i).

179.    Wherefore, Parents seek reasonable attorney's fees for their Due Process hearing, SRO proceedings, and this action for administrative review.

180.    Parents are further entitled to reasonable fees and costs for additional time expended and costs incurred in seeking attorney's fees in this federal action.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

- Assume jurisdiction of this action.

- Grant Parents leave to introduce additional evidence to rebut the SRO's *sua sponte* arguments.

- Perform an independent review of the record.

- Find that the IHO and SRO erred when they held that the District offered M.K. a FAPE.

- Vacate the IHO's and SRO's decisions and hold that the District failed to offer Parents and M.K. a FAPE.

- Find that Imagine Academy was an appropriate private placement.

- Find that Parents are entitled to reimbursement of tuition they have paid to Imagine Academy and/or direct payment of tuition to Imagine Academy, and that no equitable factors require reduction of tuition reimbursement or direct payment.

- Find that Parents are prevailing parties under the IDEA.

- Award Parents reasonable attorney's fees, costs, and expenses.

- Award Parents pre- and post-judgment interest.

- Award any other relief this Court deems appropriate.

Dated: March 17, 2025
Plymouth, MA

Respectfully Submitted,

/s/ Benjamin J. Hinerfeld, Esq.
**Law Offices of Benjamin J. Hinerfeld**
9 Stoddard Street
Plymouth, MA 02360

1528 Walnut Street, Suite 1100
Philadelphia, PA 19102
447 Broadway 2nd Floor
New York, NY 10013
Office (508) 591-0385
Cell (215) 694-7432
Fax (215) 689-2423
Ben@hinerfeldlaw.com

Nicole D. Venditti, Esq
(EDNY admission pending)
**Law Offices of Susan Deedy & Associates**
Attorneys for Plaintiffs
1600 Stewart Avenue, Suite 609
Westbury, NY 11590
Office: (516) 221-8133
Fax: (516) 221-3011
nvenditti@susandeedylaw.com

*Co-Counsel for Plaintiffs*

# Appendix A - Table of Acronyms

| | |
|---|---|
| **AAC** | Augmentative Alternative Communication |
| **ABA** | Applied Behavior Analysis |
| **ADL** | Activities of Daily Living |
| **AT** | Assistive Technology |
| **BCBA** | Board Certified Behavior Analyst |
| **BIP** | Behavior Intervention Plan |
| **BOCES** | Boards of Cooperative Educational Services |
| **CSE** | Committee on Special Education |
| **FAPE** | Free Appropriate Public Education |
| **FBA** | Functional Behavior Assessment |
| **FOFD** | Findings of Fact and Decision |
| **IDEA** | Individuals with Disabilities Education Act |
| **IEP** | Individualized Educational Program |
| **IHO** | Impartial Hearing Officer |
| **LEA** | Local Educational Agency |
| **LRE** | Least Restrictive Environment |
| **SRO** | State Review Officer |
| **TDN** | Ten-Day Letter |