## Law Office of Benjamin J. Hinerfeld

| | | |
|---|---|---|
| 1528 Walnut Street, Ste 1100 | 9 Stoddard Street | 447 Broadway, 2nd Floor |
| Philadelphia, PA 19102 | Plymouth, MA 02360 | New York, NY 10013 |
| (Tel.) 215.694.7432 | (Tel) 508.591.0385 | (Fax) 215.689.2423 |

Ben@Hinerfeldlaw.com    Licensed in MA, PA, NY, NC, NJ, DE (inactive)

July 2, 2025

**Via Electronic Filing**
Hon. James M. Wicks
United States District Court, Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

> Re: *Y.E. and M.K. o/b/o M.K. v. Hewlett Woodmere Union Free Sch. Dist.*, No 2:25-1481-JMA-JMW - Motion to Supplement the Administrative Record.

Dear Judge Wicks,

In denying Plaintiffs relief, the New York State Review Officer (SRO) made *sua sponte* arguments based on incorrect, unsupported factual claims. To complete the administrative record and rebut these arguments, Plaintiffs seek to introduce the limited affidavit testimony of Board Certified Behavior Analyst (BCBA) Nicole Iannarone.[1] While this motion does not address the full merits of the SRO's decision, the affidavit is relevant, non-cumulative and useful. It will allow the Court to decide – on a complete record – whether the District offered M.K. a Free Appropriate Public Education (FAPE).

    A. **Standard of Review: Courts deciding IDEA appeals admit additional evidence that is relevant, non-cumulative and useful, without turning appeals into *de novo* trials.**

The Individuals with Disabilities Education Act (IDEA) states that courts shall "receive the records of the administrative proceedings," and "hear additional evidence at the request of a party."[2] The Second Circuit has never addressed this provision. The consensus among district courts – consistent with the IDEA's broad remedial purpose – is that they have discretion to admit additional "relevant, non-cumulative and useful" evidence that can assist "in ascertaining whether Congress's goal has been and is being reached for the child involved."[3] The standard is fairness towards the parties without turning actions for administrative review into *de novo* trials.[4]

---

[1] *See* Affidavit of Nicole Iannarone, MA, L-BCBA, dated July 1, 2025 (Iannarone Aff.), attached as **Exhibit A**. Ms. Iannarone's background and credentials are listed in ¶¶ 4-20.  Ms. Iannarone's resume is attached as **Exhibit B**.
[2]  20 U.S.C. § 1415(i)(2)(C)(I, (ii); *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012).
[3] *M.S. v. N.Y.C. Dep't of Educ.*, No. 13-cv-3719 (RRM) (VMS), 2013 U.S. Dist. LEXIS 161691, at *14 (E.D.N.Y. Nov. 12, 2013) (quoting *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 759-60 (3d Cir. 1995)).
[4] *See M.S.,* 2013 U.S. Dist. LEXIS 161691, at *19.

1

Admitting Ms. Iannarone's affidavit, subject to her availability for cross-examination, strikes this balance.

### B. Background for this motion.

#### 1. The IHO endorsed District IEPs that lacked detail about Applied Behavior Analysis (ABA), the core of M.K.'s education.

During a New York IDEA Due Process hearing, the school district bears the burden to prove affirmatively that it offered a child a FAPE.[5] It must introduce evidence proving that its proposed individualized educational program (IEP) is appropriate.[6] The parties here generally agreed with Parents' expert witness, Dr. David Marks, that M.K. needed an IEP anchored in Applied Behavior Analysis (ABA).[7] ABA is the only evidence-based modality for teaching autistic children. It is a rigorous, data-driven science that a school must implement in individualized manner.[8] The District therefore had to prove it offered an IEP with appropriate ABA programming, individualized to M.K.'s unique needs.

The District introduced two IEPs for the 2023-2024 school year at trial, but neither described ABA programming individualized for M.K.'s needs.[9] The first IEP, dated June 14, 2023,[10] was written for M.K. to attend an 8:1:2[11] classroom at Ogden Elementary School, a District-operated school. While it copied Dr. Marks's recommendations for ABA, it had no

---

[5] N.Y. Educ. Law § 4404(1)(c); *M.H.,* 685 F.3d at 225. In most jurisdictions, the party who files the action bears the burden of proof.

[6] The Supreme Court has explained how an individualized educational program should, as its name indicates, be tailored to a child's unique needs: "The IEP is the centerpiece of the statute's education delivery system for disabled children. A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. The IEP is the means by which special education and related services are tailored to the unique needs of a particular child." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017).

[7] T663.

[8] *See, e.g.,* Ex. A at ¶ 21 ("ABA is the science of human behavior founded in the early 1950s. It is an evidence-based practice and considered the gold standard of treatment for individuals with autism spectrum disorder."); ¶ 32 ("To teach new skills (academic, social, behavioral), ABA requires the collection of detailed, accurate, individualized data."); ¶ 40 (noting that all components of an ABA program are "highly individualized" and that "[t]here are no 'blanket' ABA classroom criteria, as each learner requires individualized goals and interventions based on unique assessment data.").

[9] Allowing the District to defend two IEPs was a serious error by the IHO; however, that is a merits argument not at issue here.

[10] *See* DE 35-54. References to the prefix "**DE**" are to District Exhibits in the administrative record sent to the Court by the SRO. The remaining prefixes from the tabs in the SRO's record are: **SD** - SRO decision; **I** – IHO decisions; **P** - Parties' pleadings to the SRO; **C** – Certifications; **S** - Supplemental documents; **PE** - Parent exhibits; **IE** – IHO exhibits; **T** – Transcripts (NOTE: SRO's red T-page numbers do not match the internal transcript's black page numbers. References in this brief are to the SRO's red T-page numbers); **CO** - Correspondence.

[11] *See* DE-36. "8:1:2" means 8 students, 1 teacher, 2 aides.

additional detail about how an ABA program would be individualized for M.K. during the 2023-2024 school year. Instead, in the section listing M.K.'s promised "special education programs and services," it stated that a BCBA would provide "behavior intervention services" once daily for six hours – that is, the District would hire an outside, contracted BCBA to serve as M.K.'s 1:1 behavioral aide.[12]

The second IEP, dated Sept. 6, 2023, was written for M.K. to attend a 6:1:2 classroom at the highly restrictive, BOCES-operated Willet Avenue School.[13] Although written to be implemented in a far more restrictive educational setting, with different staffing, the September 2023 IEP was largely identical to the June 14, 2023 IEP. It had the same narratives, recommendations and annual goals.[14] The chief difference was that the September IEP did not list a BCBA to serve as M.K.'s 1:1 aide.[15]

At the due process hearing, the impartial hearing officer (IHO) let Kathleen Granelli, the District's Assistant Director of Special Education, give impermissible "retrospective" testimony to try to rehabilitate the District's insufficiently detailed IEPs.[16] She could not do so. The following exchange is her entire direct testimony about ABA – the programmatic core of M.K.'s IEP:

> Q: Can you explain how, if at all, that program is anchored to principles of [ABA]?
>
> A: It's highly individualized, there's opportunities for discrete trials. Additionally, an ABA therapist was recommended six hours daily for M."[17]

The June 2023 IEP did not actually mention "discrete trials," an ABA term of art.[18] On cross examination, Granelli could not explain what she meant:

> Q:   Earlier you said that you felt that the 8:1:2 was appropriate because it was anchored to principles of ABA; is that true?
>
> A:   I don't recall exactly what I said.

---

[12] *See* DE-51.

[13] *See* DE 12-30. Board of Cooperative Educational Services (BOCES) is a New York State run entity that provides shared educational programs and services to school districts within the state. *See* https://www.boces.org/about-boces/ (visited July 1, 2025).

[14] *Compare* DE 37-50 *with* DE 13-26.

[15] *See* DE-27.

[16] The rule against retrospective evidence is essentially a "four-corners of the document" rule. A district cannot present evidence at trial that it would have provided materially different services than it promised in its IEP (*i.e.*, rehabilitate an inadequate IEP). *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174 (2d Cir. 2012) ("[W]e conclude that the use of retrospective testimony about what would have happened if a student had accepted the Department's proposed placement must be limited to testimony regarding the services described in the student's [IEP]. Such testimony may not be used to materially alter a deficient written IEP by establishing that the student would have received services beyond those listed in the IEP.")

[17] T57:21-58:2.

[18] Dr. Marks explained at trial that "discrete trial" learning is one of several ABA concepts that can be woven into an ABA program as part of a granular learning process. T662:13-663:13.

> Q: You also said that it was individualized. Let me ask you a question. What does it mean to be anchored to principles of ABA?
>
> A: I'm not sure.
>
> Q: You also mentioned that there was an opportunity for discrete trials. Is that the case in the 8:1:2?
>
> A: I'm not sure.
>
> Q: Did the opportunity for discrete trials mean that a program is anchored in ABA?
>
> A: I don't know.[19]

Contrary to the Supreme Court's prescription in *Endrew F.*, Granelli, one of the District's key witnesses, failed to give anything approaching a "cogent and responsive" explanation for the IEP team's program recommendation.[20] She did not even understand her own terminology. Moreover, in addition to the District's IEPs having no meaningful detail about ABA, contemporaneous emails showed that the District would not have been able to provide a daily 1:1 BCBA for M.K., as it promised to do.[21]

Nevertheless, the IHO held that the District's June 2023 IEP was appropriate as written.[22] She credited Granelli's retrospective testimony about there being "opportunities for discrete trials," disregarding that Granelli could not explain what she meant. And the IHO did not analyze how the proposed program was individualized for M.K.

### 2. Parents filed a Request for Review with the SRO, who sustained the IHO's decision based on his *sua sponte* findings, advancing arguments not briefed by the District.

Parents filed a verified Request for Review (RFR) to the SRO challenging the IHO's findings.[23] Parents challenged the IHO's findings on, among other issues, the District's inadequate detail on ABA programming, and improper staffing and classroom composition at Ogden Elementary and BOCES Willet Avenue.[24] In response, the District summarized the IHO's findings with respect to the June 2023 IEP's provision of ABA.[25]

The SRO sustained the IHO's decision.[26] In doing so, however, he made arguments that the District never made, based on factual claims that had no support in the record. Showing a misunderstanding of ABA programs and the role BCBAs play in them, he held that the June 2023 IEP provided a valid ABA program:

---

[19] T85:2-17.
[20] *Endrew F.*, 580 U.S. at 404.
[21] *See* Ex. OO (PE-89-91) (District emails show that neither of the two ABA agencies considered by the District could have provided a BCBA for 6 hours per day).
[22] *See* I-16-17.
[23] *See* P4-13 (RFR), P16-45 (MOL in support of RFR).
[24] *See* MOL ISO RFR. P-27-30, 41-45.
[25] P-72.
[26] *See* SRO Opinion (SRO Op.) (SD1-22).

> To the extent that the parents assert, on appeal, that the recommendation for individual BCBA services for six hours per day is not a program "anchored in ABA," such an argument makes little sense as it is representative of an individual service designed to deliver individual behavioral support to the student throughout the school day.
>
> Review of the psychologist's testimony regarding what he intended when he recommended a program "anchored in ABA" shows that he indicated he expressed a concern about the 8:1+2 special class, but does not show an objection to the recommendation for individual BCBA services (Tr. pp. 577-79).
>
> Additionally, in his description the psychologist identified his preferred program for the student as a program where the staff "working with [the student] hav[ing] formal training, background, expertise, credentials in working with youth on the autism spectrum" (Tr. p. 577); something that would be addressed by having a BCBA with the student six hours per day. The parent's arguments to the contrary are belied by the evidence and not plausible.[27]

Broken down, this crucial passage makes four incorrect factual claims / legal arguments that the District itself never made:

1. A program "anchored in ABA" can be an "individual service" "designed to deliver individual behavioral support to the student throughout the school day."

2. Dr. Marks did not object to the District's recommendation for individual BCBA services. (Tr. pp. 577-79).

3. BCBAs all have "background, expertise, credentials in working with youth on the autism spectrum."

4. A BCBA acting as M.K.'s daily 1:1 aide would "address" Dr. Marks's concerns about M.K.'s need for ABA programming.

Parents seek a chance to rebut these incorrect claims.

---

[27] SRO Op. at 18 n.12 (SD-18). That this holding is in a footnote makes it no less important. If language is necessary to the decision, it is part of a holding, not dicta. *See, e.g., U.S. v. Washington*, 103 F.4th 917, 931 (2d Cir. 2024) ("Portions of a court's opinion that turn out to have been unnecessary to its decision may be characterized as dicta.") (Quotes omitted). Moreover, if the SRO's findings are here not a holding, then his decision would be even more flawed for failing to decide the central substantive question here: Did the IEP provide M.K. a valid ABA program within its offer of FAPE?

### C. Argument: BCBA Iannarone's affidavit is *relevant, useful and non-cumulative*. Parents should be allowed to introduce it to rebut the SRO's unsupported, *sua sponte* findings of fact and law.

BCBA Iannarone's affidavit is a relevant, useful and non-cumulative response to the SRO's improper decision to go outside the pleadings and the record for his holding. As Iannarone explains, all four of his points about ABA programs and BCBAs – dispositive to his opinion – are wrong. Parents should be allowed to explain why.

*First*, the District itself never argued that – in the SRO's words – a program anchored in ABA is an "individual service designed to deliver individual behavioral support to the student throughout the school day." This was the SRO's own argument. And his description of an ABA *program* as an "individual service" – akin to occupational or speech therapy – reveals his fundamental misunderstanding of ABA programing.

Ms. Iannarone's testimony rebuts this incorrect, *sua sponte* factual claim. As she explains, an ABA program cannot be an "individual" service; it is always a team endeavor.[28] She also clarifies the crucial difference – ignored by the SRO – between a complete ABA program, which a child on the autism spectrum like M.K. required, and a behavioral support program, which is just a part of an overall educational program.[29]

*Second*, the District never argued that Dr. Marks failed to object to the recommendation for individual BCBA services. The SRO made this argument on his own. But Marks did not expressly object to the proposal for individual BCBA services for good reason: he was never asked to opine on it.[30] Consistent with Iannarone's testimony, Marks repeatedly described an ABA program implemented by multiple persons, not an individual service.[31]

*Third*, the District never argued that all BCBAs have "background, expertise, credentials in working with youth on the autism spectrum." The SRO made this claim on his own, and he was wrong. There is no evidence supporting his assumption that all BCBAs have such background, experience, and credentials to support M.K.'s unique needs.[32] As Ms. Iannarone explains:

---

[28] Ex. A at ¶¶ 41-49 (discussing the personnel necessarily involved in designing and implementing a valid, public-school based ABA program); ¶ 74 (reiterating that ABA is group/team endeavor and listing essential components of ABA and the personnel needed to carry them out).

[29] *Id*. at ¶¶ 50-51 (distinguishing a complete ABA program, which uses ABA as its primary modality for teaching academics and behaviors, from a Behavior Intervention Program or BIP, which addresses a child's maladaptive behaviors).

[30] *See* T659-64.

[31] *See* T660 (discussing "those" working with M.K.); T694-95 (describing on cross a program "instituted by individuals who are trained in ABA," that ABA not be an "afterthought," and that "ABA should permeate his program.").

[32] The SRO's statement categorically endorsing a theoretical BCBA undermines a basic tenet of due process: the right to test an opposing witness's credentials, biases, experience and overall credibility through cross examination. *See* N.Y.C.R.R. § 200.5(j)(3)(xii)(c), (d) (witnesses must be made available for cross examination).

6

> Many BCBAs do work with youth on the autism spectrum, but not all do. BCBAs vary dramatically in their formal training, background and areas of experience and expertise. Some BCBAs graduate without ever administering a skills-based assessment and may have never conducted an FBA in a natural setting. Moreover, many BCBAs are graduating, passing their boards and may have never stepped foot in a public-school setting.[33]

Parents should be allowed to rebut the SRO's finding that any BCBA would have had the background, expertise and credentials to implement an ABA program with fidelity and address M.K.'s unique needs.

*Fourth*, the SRO was wrong to say – again, making an argument not advanced by the District – that providing M.K a daily 1:1 BCBA would, in itself, constitute a valid ABA program. Iannarone explains why this is wrong: (1) An ABA *program* is a team endeavor, not an individual service, so more personnel than a single BCBA would be needed to implement an ABA program;[34] and (2) BCBAs simply do not take jobs as 1:1 aides.[35] Rather, BCBAs working in a school setting are responsible for training staff, analyzing data, and modeling and monitoring implementation of the program, not day to day instruction.[36]

Parents could not have anticipated at trial that the SRO would make novel arguments and supply incorrect facts about BCBAs and ABA to defend the District's IEPs. One of the IDEA's chief remedial goals is to give parents real *due process*: the chance to have a tribunal assess through a regular adversarial process whether their school district has offered their child a FAPE. Here, that means giving Parents the chance to rebut the SRO's new arguments and incorrect factual claims through BCBA Nicole Iannarone's limited testimony.

---

[33] Ex. A at ¶ 75.
[34] *See* Ex. A at ¶¶ 31-48 (explaining why one BCBA cannot ethically carry out the design, monitoring, implementation, data collection and refinement tasks of an ABA program); ¶¶ 63-64 (explaining that the June 2023 program, as written, would not work because the BCBA would be unable to fulfill the various roles required of a valid ABA program).
[35] *Id*. at ¶ 63 (noting that she has never seen a BCBA serve as a 1:1 aide); ¶ 65 (noting that hiring a BCBA as a 1:1 aide would be prohibitively expensive); ¶ 76 (noting that it is quite implausible that an experienced or seasoned BCBA would agree to work as a 1:1 aide).
[36] *Id*. at ¶¶ 44-45 (noting that the BCBA's role on the ABA team is to administer assessments, conduct functional behavior analyses (FBAS), collaborate with team members, modify the child's program and train staff); ¶¶ 73-74 (noting that SRO Bates's discussion of the BCBA shows a fundamental misunderstanding of what BCBAs do, a that the term BCBA "is not synonymous with an 'ABA program'"); ¶¶ 78-79 (opining that Bates's decision to infer an entire ABA program from the term/credentials "BCBA" was "egregiously simplistic" and a "fundamental misunderstanding of what components make up a comprehensive public school ABA program.").

      In summary, Ms. Iannarone's testimony is **relevant** to the central issue of whether the District offered M.K. a valid ABA program; it is **non-cumulative** in that it addresses new facts and arguments from the SRO, which Parents could not have anticipated; and it is **useful** because it gives the Court the factual background it needs to determine whether Congress's goal of a free appropriate public education was being reached for M.K.

## CONCLUSION

      Wherefore, Parents respectfully request that the Court grant their motion to supplement the administrative record with Nicole Iannarone's affidavit testimony and resume.

Respectfully submitted,

*[signature]*

Cc: all parties *via* ECF.

Benjamin J. Hinerfeld
**LAW OFFICE OF BENJAMIN J. HINERFELD**
9 Stoddard Street
   Plymouth, MA 02360
1528 Walnut Street, Suite 1100
   Philadelphia, PA 19102
447 Broadway 2nd Floor
   New York, NY 10013
Office (508) 591-0385
Cell (215) 694-7432
Fax (215) 689-2423
Ben@hinerfeldlaw.com
*Licensed in MA, PA, NJ, NY, NC & DE (inactive)*

Nicole D. Venditti, Esq.
*Counsel*
**LAW OFFICE OF SUSAN J. DEEDY & ASSOCIATES**
1600 Stewart Avenue, Suite 609
Westbury, New York 11590
(516) 221-8133 (t)
(516) 221-3011 (f)
NVenditti@susandeedylaw.com